[Civ. No. 25650. Second Dist., Div. One. May 8, 1962.]

PAUL H. TAYLOR et al., Plaintiffs and Respondents, v. PAUL SANFORD, Defendant and Appellant.

332

Leo J. Friis, Talt & MacMahon and Robert W. MacMahon for Defendant and Appellant.

Krystal & Paradise and John H. Saunders for Plaintiffs and Respondents.

LILLIE, J.—Plaintiff sued for an accounting and one-half of all royalties defendant received from the use of a chemical compound known as ST-131 extract; the defense claimed that it is no longer used by defendant's licensees (Far-Best Cor-

poration and Sanford Process Company, codefendants herein). The main issue was the identity and definition of ST-131 as compared with an extract defendant claims has been used by his licensees since early 1953 (hereinafter referred to as the "new" extract). The trial court found the "new" extract to be the same as ST-131 and entered judgment for plaintiff, from which defendant appeals. Appellant contends that there is no evidence to support the finding that the two extracts are the same composition of matter made by the same process. (Whenever herein the term "extract" is used, it has the same meaning as "chemical composition of matter," "composition of matter" or "electrolyte.")

This litigation had its genesis in defendant's invention and his subsequent efforts to protect it through various patent applications resulting in United States Patent No. 2743221, and an agreement with plaintiff to share royalties thereon. The evidence we necessarily view in the light most favorable to respondent. Defendant, a chemist, invented an extract he called "ST-131." On July 18, 1951, he prepared and filed thereon patent application No. 237361 (Ex. 7), wherein he described ST-131 extract by the process used to make it. Meanwhile, he gave plaintiff, a chemist, permission to experiment with ST-131 to determine its usefulness in anodizing metals. Prepared and typed by defendant, an agreement between them was executed July 5, 1952; thereunder, plaintiff continued his experiments in consideration of one-half of the net profits from all royalties received from the sale or use of the "electrolyte called ST-131, for which letters of patent application has been given the No. 237361." On July 9, 1952, defendant filed a second patent application No. 297895 (Ex. 8). Plaintiff having demonstrated the usefulness of ST-131 extract in the process of anodizing metals, defendant, on October 6, 1952, entered into certain patent license agreements with codefendants, later amended to list the three applications for letters patent. On August 20, 1954, defendant filed a copending application, numbered 451310, a continuation-in-part of his first (No. 237361) and second (No. 297895) applications, which resulted in the granting of U. S. Patent No. 2743221 on April 24, 1956. (Ex. 9.) (Patent application No. 451310 is in legal effect the same as patent application No. 237361 referred to in the agreement of July 5, 1952.) Since October 6, 1952, defendant's licensees have paid royalties to him under their agreements; through October, 1954, defendant has regularly accounted to plaintiff for such royal-

ties. However, after October 1954, defendant refused to further account. to or pay plaintiff, representing that his licensees had not used ST-131 extract since early 1953 but were using a "new" extract produced from a different recipe, and thus he owed plaintiff nothing under his agreement.

Among other facts, the trial court found: that the compositions of matter and the processes described in United States Patent No. 2743221 are the same as, and include, the ST-131 extract and the processes referred to in the agreement (Finding of Fact, No. 13); that said patent issued upon application No. 451310, a continuation-in-part of applications Nos. 237361 and 297985 (Findings of Fact, No. 14); that the ST-131 extract disclosed in patent application No. 237361 dominates, covers and fully anticipates the claims of patent No. 2743221, and the "new" extract. (Finding of Fact, Nos. 15, 16); and that the licensees are using a composition of matter—("new" extract) which is the same as ST-131 and that set forth in patent No. 2743221, and processes which are the same as those described in the agreement of July 5, 1952, and in said patent. (Finding of Fact, No. 20.) The trial court concluded that "[T]he expression 'ST-131' as used in said agreement of July 5, 1952, . . . is the same as all of the compositions of matter covered in patent number 2743221 and all compositions of matter ("new" extract) used by . . . (defendant's licensees)." (Conclusions of Law, par. V.)

Relying almost exclusively on certain defense testimony and a favored interpretation of the patent documents, and discrediting the testimony of plaintiff's expert witness, appellant contends that there is no evidence to support the finding that ST-131 extract and the "new" extract are the same composition of matter made by the same process. Directed mainly to the kind of proof offered by plaintiff to sustain his burden in the lower court, he argues that plaintiff introduced no evidence concerning the physical properties, chemical analysis, formula or characteristics of any chemical extract; the patent claims are not determinative of the issue; and the matter of domination of patents was not properly before the court.

Appellant's argument must be considered in light of the background of this litigation, in particular, the method employed by defendant to describe ST-131 extract in his agreement with plaintiff and various patent applications, which description necessarily controlled the kind of proof upon which plaintiff had to rely in the court below and which defendant now seeks to reject as neither proper nor suffi-

cient to sustain the judgment. Plaintiff's basic problem lay in the matter of proof, created by the complex nature of the chemical compound invented by defendant and further complicated by his failure to describe ST-131 extract other than as a broad concept. Unlike the usual chemical patent case there is an absence of expert testimony concerning the organic composition of the two extracts and because their complex nature defies accurate ascertainment of their chemistry, neither plaintiff nor defendant could, or did, offer in evidence chemical analysis or formula of the compounds. (In application No. 297985 defendant conceded ST-131 extract "to be a highly complex material, the chemical composition or ingredients of which have not been able to be ascertained by applicant (defendant) . . ." (Ex. 8) ; and plaintiff's expert confirmed this in his testimony—that the patent does not purport to describe the chemical contents of ST-131 but describes the composition of matter by reference to the process by which it is made, and is the patent of a process rather than of specific ingredients to be used in such process: ". . . it is a little confusing because of lack of technical approach initially here, . . . . Apparently the chemistry of the extract is so complex that they couldn't define exactly what the material was so they defined the material by the process by which it was made, that is, extracting the coal or the other material. That is the way they define the material or the product so that it is not really a patent process; it is a patent on a product, essentially, but defined by process language; that is, how it is made.")

Defendant prepared and typed the agreement with plaintiff in which he described ST-131 extract solely in "patent" language, identifying it by reference to the electrolyte "for which letters of patent application has been given the No. 237361." In that patent application defendant had defined ST-131 as a broad concept in "process" language—in terms of the general procedure used to make it—specifying no formula or analysis to identify its chemical composition but only illustrating its broad concept by setting up several examples of recipes which can be followed using the general process disclosed therein. Thereafter, in contracting with his licensees, defendant again dealt in terms of patent. Moreover, at *no* time has defendant ever disclosed to plaintiff the recipe for ST-131, the latter having been excluded from all proceedings in which the recipes were described, and the testimony regarding the method and extract produced therefrom having been taken in "in camera" proceedings by the lower court.

Thus, because of defendant's failure to define the organic composition of ST-131 extract and his resort to "process" language to describe it in his patent documents, and because of his refusal to disclose the recipe for ST-131 in the agreement of July 5, 1952, plaintiff has never had any way to identify ST-131 extract except by the description of the general process disclosed by defendant in patent application No. 237361 (Ex. 7); has no other way of knowing if the recipe for the claimed "new" extract differs from that used to make ST-131; and has at all times been compelled to rely upon the adequacy of defendant's description of ST-131 extract contained in application No. 237361. He proposed to, and did, meet his burden of proof by relying upon defendant's own documents and their interpretation by a patent expert. Such proof disputed defendant's testimony that the two compounds are dissimilar. Confronted with this conflict the trial court had the duty to resolve the same and to determine the factual issue (*Chan* v. *Title Ins. & Trust Co.*, 39 Cal.2d 253 [246 P.2d 632]), and its finding that the two extracts are the same will not be disturbed by this court. (*Burrows* v. *Burrows*, 18 Cal.App.2d 275 [63 P.2d 1135]; *Rolland* v. *Porterfield*, 183 Cal. 466 [191 P. 913]; *Berniker* v. *Berniker*, 30 Cal.2d 439 [182 P.2d 557].)

The main documents upon which plaintiff predicated his case are those prepared and drafted by defendant—the agreement of July 5, 1952, the three patent applications, the patent and a letter.

Refusing to disclose his recipe for ST-131 extract, defendant in his agreement with plaintiff upon which this claim is based, described ST-131 by reference to the patent application; it provides: "I hereby agree to give (plaintiff) . . . one-half of the net profits, losses, expenses, from all royalties or dividends received from the sale or use of my electrolyte called ST-131, *for which letters of patent application has been given the No. 237361,* and the hard coating process on which it shall be used on either aluminum or magnesium."

ST-131 extract is defined in patent application No. 237351 (Ex. 7) as a broad concept described by the general procedure used to make it; that this process encompasses many variables is reflected in the specific examples of recipes that "can be" developed from it. Therein defendant defined ST-131 extract as "an organic acid electrolyte" (Claim 3, p. 6) and variously described it by its process thus:

". . . acid[s] . . . derived from peat or lignite coal by

cooking the peat or lignite coal at temperatures considerably above boiling'' (p. 6);

''. . . acid[s] derived by heat and pressure process from peat, lignite and low-grade coal . . .'' (Claim 5, p. 14); and

''. . . acid[s] derived from peat, lignite and low-grade coal by heat and pressure process'' (Claim 6, p. 14).

To demonstrate the scope of this broad concept and the variations contemplated thereunder, defendant set up several recipes as specific examples of use under the general process:

''Thus, *for example,* one part of ground peat, or one part of ground lignite coal together with six parts of distilled water *can be* cooked for six hours at 290° F.'' (P. 3.)

''. . . made by processing peat, lignite or low-grade coal at temperatures between 250° and 350° F, and pressures between 10 and 120 pounds per square inch for from 6 to 24 hours, the time required to process the organic material being less as the temperature and pressure are increased. *For instance,* . . . derived by cooking one part peat or ground lignite coal with 6 parts of water for 7 hours at 350° F.'' (P. 15.) (Emphasis added.)

We set up in some detail the following to illustrate the broad concept of ST-131 as defined by defendant himself. In application No. 297985 (Ex. 8) he described ST-131 extract as: ''. . . acid derived from peat, lignite or low-grade coal by a process of heat and pressure.'' (P. 5.) Therein the U. S. Patent Office allowed claims in which ST-131 extract was described as:

''. . . an acidic extract of a substance chosen from the group consisting of low-grade coal, lignite and peat, said extract being obtained by cooking a mixture of said substance with water'';

''. . . acids . . . derived from peat or lignite coal by cooking the peat or lignite coal at temperatures considerably above boiling. Thus, *for example,* one part of ground peat or one part of ground lignite coal together with six parts of distilled water can be cooked for 6 hours at 290° F.'' (P. 17.) (Emphasis added.);

''The above mentioned derivative from peat, lignite, or low-grade coal is an aqueous extract obtained by cooking these materials with water at elevated temperatures of say at least the normal boiling point of the mixture at atmospheric pressure, and preferably at temperatures considerably higher'' (p. 39); and

". . . acids . . . as obtained by cooking said coal in water at temperatures in excess of the boiling point." (P. 19, Claim 1.)

And in a claim allowed by the Patent Office, it is defined as: ". . . an acidic extract of a substance chosen from the group consisting of low-grade coal, lignite and peat, said extract being obtained by cooking the mixture of said substance with water." (Notice of Allowance of Claim, p. 52.)

In the copending application No. 451310, which resulted in United States Patent No. 2743221, defendant described ST-131 extract in the same manner as in application No. 237361.

"I have discovered a novel composition in the form of an aqueous extract of brown or low-grade coal, lignite or peat, which can be obtained by extracting brown or low-grade coal, lignite or peat obtained from various localities, with water. The extraction is particularly made more rapid and yield is increased by extraction at elevated temperature, preferably the atmospheric boiling point of the mixture or more elevated temperature, e.g., up to 290° F or higher, and most desirably by extraction at elevated temperature under pressure for a period sufficient to produce an aqueous acid solution . . .";

"I can also obtain such extract by refluxing the aqueous mixture of brown coal, lignite or peat at atmospheric pressure over an extended period of say 24 hours . . .";

"One part by volume of Georgia peat ground and mixed is added to 5 parts of water, and the resulting mixture is cooked at 20 lbs gage pressure for 48 hours . . ."; and

"One part by weight of ground peat is mixed with 6 parts of water, and the mixture is fed to an autoclave. The mixture is cooked therein at about 290° F and at autogenous pressure for 6 hours."

In United States Patent No. 2743221 issued April 24, 1956, defendant declares: "While I have described a particular embodiment of my invention for the purpose of illustration, it should be understood that various modifications and adaptions thereof may be made with the spirit of the invention as set forth in the appended claims."

Claims of this patent describing the extract are as broad as the claims set forth in defendant's first patent application No. 237361:

"1. A novel composition of matter: an acidic extract of a substance chosen from the group consisting of low-grade coal, lignite and peat, said extract being obtained by cooking a

mixture of said substance with water at a temperature of from about the boiling point of said mixture at atmospheric pressure to above 350° F.''

''2. A composition of matter as set forth in claim 1, and wherein said cooking temperature is from above the boiling point of the mixture at atmospheric pressure to about 290° F.''

''4. A composition of matter as set forth in claim 1, and wherein said cooking is carried out in superatmospheric pressure.''

''5. A composition of matter as set forth in claim 1, and wherein the substance is peat.''

''6. A composition of matter set forth in claim 5, and wherein said cooking is had for a period of at least 48 hours.'' (Ex. 9.)

What defendant claims to be the ''new'' extract is set forth on his behalf by his licensee (Sanford Process Co.) in exhibit 4 as follows:

''An extract formed by heating 12 lbs of Georgia peat with 10 gallons of water for 72 hours at 20 lbs. pressure. . . .''

The patent applications and patent refute any claim that: ''. . . using peat and water and heating the mixture to 290° F for approximately 6 hours,'' disclosed as an example of a recipe that can be developed from the general process in application 237361, is the sole recipe for ST-131 extract, and that the agreement of July 5, 1952, was limited thereto. Tracing defendant's definition of ST-131 extract through the foregoing documents, it is apparent that what defendant claims to be the recipe to which the parties are limited under their agreement, is but an example set up by defendant to illustrate the broad concept of the general procedure to make it—the wide range of time and temperature for cooking and the variety of recipes contemplated thereunder; the process disclosed in application No. 237361 is far broader than the example referred to by defendant. And it is just as apparent that defendant had no wish to limit himself to any particular formula or recipe but wanted to and did keep his definition of ST-131 sufficiently broad to accommodate various modifications and adaptations.

That the broad concept of ST-131 extract described in application 237361 contemplates and includes the claimed recipe for the ''new'' extract (Ex. 4), which is well within the limits of the general process, is borne out, not only by exhibits 4, 7, 8 and 9, but by the testimony of plaintiff's expert. He

demonstrated that ST-131 extract and the ''new' extract are the same chemical compound because, 1. the procedures used to make them are the same and, 2. the broad concept of ST-131 extract disclosed in application 237361 dominates, covers and fully anticipates the claims of United States Patent No. 2743221, and the ''new'' extract.

Mr. Martin, a lawyer, specializes in chemical patents; he is admitted to practice before the United States Patent Office and holds a degree in chemical engineering. Without objection the trial court accepted his qualifications as an expert on patent law, particularly with respect to chemical patents. Testifying that application 237361 defines the composition of matter as a broad general concept by reference to the process by which it is made, and that ST-131 extract derived from that process is the same as the ''new'' extract derived from the recipe described in exhibit 4, it was his opinion that ST-131 and the ''new'' extract are the same because the procedures to make them are the same. *Without objection* he answered in the *affirmative* the following question: ''Would you say that, with respect to all three of the compositions which are described in exhibit 4 (which includes the so-called ''new'' extract), that all three . . . are compositions which are extracts, . . . which would have normally have been derived . . . have been conceived of or within the range of those compositions normally conceived of in the ordinary processing of an application for a patent on the substance described in exhibit 7 (application No. 237361) . . .?'' Martin's opinion was based upon his training and background in patent law, his long experience in handling and evaluating chemical patent problems, his knowledge as an expert that extracts produced from similar recipes will be the same, and his exhaustive study of the documents prepared and executed by defendant and received in evidence; it was not based on hypothetical facts or testimony given by someone else or facts not in evidence or only those portions of records favorable to respondent.

Martin further testified that as a matter of patent law, the two extracts are the same; that the ''new'' extract is subject to, subservient to and covered by the invention described in patent No. 2743221 and application No. 237361. It was his opinion that the broad concept of ST-131 extract disclosed in application 237361 dominates and covers and fully anticipates the claims of patent No. 2743221 and the ''new'' extract. *Without objection,* he further stated ''that the three extracts referred to in the letter (Ex. 4) (including

the "new" extract) are covered by at least some of the claims of the Sanford patent (2743221)," that the three extracts are one and the same for patent purposes, and that the three extracts are the natural outgrowth of the patenting process of the ST-131 extract described in application No. 237361.

Contrary to appellant's claim, this testimony based upon patent law was relevant and the evidence relating to infringement and domination of the patent was proper. First, it was defendant himself who set up this method of proof by electing to employ patent terms to define the subject of his agreement with plaintiff and to license the use of ST-131 extract. Defendant initiated, executed and terminated this entire transaction in patent language. Second, defendant has always claimed his basic discovery to be an invention; in his three patent applications and patent to protect it he described it as a broad new concept which would accommodate modifications and adaptations, and then granted licenses to others to use his invention based on the three patent applications and patent. ▮ Of what an invention consists is a matter of patent law. ▮ And third, having originally injected the issue of patents into the controversy defendant is hardly in a position to urge error on plaintiff's use of a patent expert to prove his case.

▮ Appellant's contention requires him to demonstrate that there is no evidence to support the challenged finding (*Nichols* v. *Mitchell*, 32 Cal.2d 598 [197 P.2d 550]); he, however, recites only evidence favorable to him and argues the case as though we were the judge of the weight of the evidence. Referring to it briefly, little was offered by defendant to challenge Martin's testimony. ▮ Franklin, an officer of Sanford Process Company, failed to qualify as an expert to identify the "electrolyte called ST-131," and the trial judge so stated—"[H]e may be an excellent business administrator or executive, but if he is going into the field of chemistry . . . you had better lay a little better foundation." No further foundation was laid. Moreover, Franklin admitted he had not personally made the extract used by the company prior to January or February, 1953; thus the trial judge was justified in failing to accord probative value to any opinion he may have expressed concerning differences in the extracts.

But appellant relies primarily upon his own testimony concerning the physical characteristics of the two extracts and the "substantial" differences between them, as listed in his brief. However, his testimony discloses these differences to

constitute but variations of two factors—fermentation and acidity. Relative to anodizing, defendant testified first that ST-131 extract fermented or lost its strength more quickly than the "new" extract, and second, it was less acidic. These two factors fail to reflect differences in kind—only in degree, for defendant at no time claimed that the "new" extract would not spoil, only that it does not spoil as quickly. Moreover patent No. 2743221 (Ex. 9) reveals that an extract prepared according to the disclosure therein will ferment to a greater or less degree. Whether the trial judge refused to accept defendant's testimony in this regard as credible or, accepting it, determined that the differences were not of a substantial nature, it is apparent that he did not give it the weight to which defendant thought it to be entitled. Inasmuch as the credibility of witnesses and the weight to be accorded their testimony are for the trier of fact (*Chan* v. *Title Ins. & Trust Co.*, 39 Cal.2d 253 [246 P.2d 632]; *Robinson* v. *Robinson*, 159 Cal. 203 [113 P. 155]), his determination thereon is here binding.

The same may be said of defendant's testimony that ST-131 extract required improvement resulting in his recipe for the "new" extract, which the trial court was not bound to accept. Moreover, the patent applications, patent and recipe for the "new" extract reveal no improvement of ST-131. The process remains unchanged—Claims 1 through 6 of the patent describing the same are no different than the substance of the process disclosed in application No. 237361. Thus, in view of the implied finding that either there was no improvement, or if there was it was not substantial enough to change the process and the composition of matter it produces, there is no merit to appellant's contentions that the trial court improperly interpreted or extended the terms of the agreement of July 5, 1952, to cover the "new" extract; or that an improvement patent (which he did not try to obtain) "might have been granted" covering the "new" extract.

In addition to the foregoing, defendant's conduct was not consistent with his later claim that his licensees did not use ST-131 extract after January or February, 1953. There is some dispute in the briefs concerning the correctness of the year; respondent argues the date defendant claims his licensees discontinued the use of ST-131 in favor of the "new" extract to be January or February, *1953,* as reflected in *their* letter (Ex. 4), allowing for a 20 or 21 month period during which defendant continued to pay plaintiff royalties;

while appellant, contrary to the letter says the year was 1954. Exhibit 4, written on behalf of Sanford Process Company and directed to counsel for plaintiff, specifically states that it "has not, since some time in January or February of *1953*: used ST-131 and has "employed since January or February *1953*" the "new" extract. Although a brief colloquy between counsel, relative to the year, took place when exhibit 4 was offered in evidence, it is clear from the record that plaintiffs' counsel neither accepted defendant's suggestion "the year '1953' should be '1954,' " nor entered into any stipulation or agreement effecting a change in the document, and no proof or other facts were offered to support such a change. Moreover, defense counsel subsequently accepted the 1953 date in asking Franklin: "Then it (Ex. 4) goes on to say: 'They have employed since January or February of *1953* the following extracts: (including the so-called "new" extract).' Is this a correct statement of what has taken place?" and he answered: "Yes, that is correct." However, it is undisputed that through October, 1954, defendant continued to share his royalties with plaintiff and, assuming the correct date to be January or February, 1954, there is still a 10-month period during which the licensees in exhibit 4 claimed they were using the "new" extract and defendant was sharing his royalties therein with plaintiff. The query arises—if his licensees were not using ST-131 during the 21 or 20 month or 10-month period, why did defendant continue to share his royalties with plaintiff, if the "new" extract was in fact new, why did not defendant stop paying plaintiff? Without explanation why he continued to account to and pay plaintiff royalties, if during that time the extract being used was actually different from ST-131, and in view of his position throughout the trial that any change in the ingredients or in the heat applied, however slight, would release defendant from his contractual obligation to plaintiff (an interpretation of the agreement neither fair, equitable nor in the contemplation of the parties) the fact that defendant paid over royalties to plaintiff during that time points to the only reasonable inference that the "new" extract was not in fact new, but the same compound as ST-131 and that defendant, while content to share small royalties, was unwilling to continue to do so as they became substantial, and the excuse that ST-131 was no longer being used is the result of a recent fabrication to justify his failure to honor plaintiff's contract. ■ His conduct of paying plaintiff royalties under the circumstances constitutes an admission

against interest by defendant and positive evidence tending to prove the truth of the fact to be inferred therefrom, Code Civ. Proc. § 1870, subd. 2; *Lane* v. *Pacific Greyhound Lines*, 26 Cal.2d 575 [160 P.2d 21] ; *Bonebrake* v. *McCormick*, 35 Cal.2d 16 [215 P.2d 728] ), which is sufficient to sustain a finding. (*Shenson* v. *Shenson*, 124 Cal.App.2d 747 [269 P.2d 170, 270 P.2d 896].) And it is the rule that where the testimony given by a party differs materially from such admission a conflict in the evidence is created. (*Gates* v. *Pendleton*, 71 Cal.App. 752 [236 P. 365].)

 The same may be said of defendant's act during the same period and in accord with his agreement of July 5, 1952, of charging plaintiff with half the cost of chemicals and equipment he now claims he used to develop his "new" extract ($644.93) and the cost of patent protection for his invention ($759.93). If the extract was in fact "new," is it likely that defendant would have charged plaintiff with the expenditures in connection therewith, under a contract covering only ST-131? Having charged plaintiff with half of the costs and expenses was it not an admission by defendant that they related to the work and patent rights on ST-131, a position entirely incompatible with his present testimony?

 Moreover, the court was entitled to view in the same light the fact that under their patent license agreements, which oblige them to pay royalties to defendant only for the use of ST-131 and under patent No. 2743221, the co-defendants (licensees), after January or February of 1953, to the date of trial, continued to pay royalties of over $20,000 to defendant, and defendant under those agreements accepted them. This lends some credence to the contention that, regardless of what defendant and his licensees now claim, they always have used and are still using ST-131 extract.

Inasmuch as the weight of the evidence points to the fact that the two extracts are the same composition of matter prepared by the same process by cooking peat and water, are acidic, are useful in the process to anodize metals, deteriorate and spoil and are covered by claims in United States Patent No. 2743221, and that the entire concept of the recipe for the "new" extract is well within the reasonable limits of the example set up in application No. 237361 and the patent, we deem it unnecessary to discuss the theory advanced by respondent that the laws of nature and other elementary scientific facts not in dispute, of which the lower court could take judicial notice, also confirm the finding that the recipe

for ST-131 extract and that for the "new" extract are the same.

Appellant's final argument is that "because indispensable parties plaintiff were not named in the original complaint, plaintiff Taylor cannot recover for any amounts accrued more than four years prior to the filing of the amended complaint" (A.O.B., p. 43), on the theory that until the indispensable parties were brought into the action the trial court had no jurisdiction to render a judgment in favor of Taylor.

In October, 1952, plaintiff entered into agreements with Repecka and Shannon wherein he assigned to each "15% of all monies received by me from my interest in the electrolyte called ST-131." There is no controversy between plaintiff and these two men, for plaintiff has shared all royalties received by him. While the lower court held these agreements to be partial assignments of plaintiff's interest in his agreement with defendant, the evidence shows that at the time they were made such was neither intended nor understood by them and that both Repecka and Shannon believed their claims to be "on 15% of the monies received by Mr. Taylor (plaintiff)" and looked to plaintiff, not defendant, for payments. Thus only plaintiff Taylor filed the original complaint in 1955. Defendant's answer thereto raised neither the issue of the statute of limitations nor the issue of indispensable parties, although it is clear that in 1952 or 1953 he had been told by Repecka of the assignment. However, in 1959, an amended complaint was filed wherein Repecka and Shannon were joined as parties plaintiff; the answer thereto, while affirmatively pleading the statute of limitations against Repecka and Shannon did not assert the same against plaintiff (par. I), and alleged that Repecka and Shannon were partial assignees of plaintiff and indispensable parties and the court lacks jurisdiction to proceed (par. II).

The trial court held in defendant's favor on the defense of the statute of limitations against Repecka and Shannon by limiting their recovery to the four-year period immediately preceding the filing of the amended complaint (judgment). ██ ██ But inasmuch as the statute of limitations is an affirmative defense which must be affirmatively invoked in the lower court, by not pleading the statute against the plaintiff, defendant waived the same. (*Miller* v. *Parker*, 128 Cal.App. 775 [18 P.2d 89] ; *Bliss* v. *Sneath*, 119 Cal. 526 [51 P. 848].)

As to the issue of indispensable parties, on objection to introduction of evidence, defendant urged the court was with-

out jurisdiction to hear the case because Repecka and Shannon had not been joined as parties to the action when it was originally filed, thus plaintiff Taylor could not recover. The court found Repecka and Shannon to be partial assignees, held that an accounting involves a continuing obligation on which the statute of limitations does not run, and overruled the objection.

It is conceded by both parties that the indispensable party doctrine, designed to protect a defendant from a multiplicity of suits, is harsh in its operation, thus care should be taken "to avoid converting discretionary power or a rule of fairness in procedure into an arbitrary and burdensome requirement which may thwart rather than accomplish justice." (*Bank of California* v. *Superior Court,* 16 Cal.2d 516, 521 [106 P.2d 879].) From the record we note, contrary to appellant's contention, that his conduct in this connection is not entirely without fault. The evidence shows that when the original complaint was filed plaintiff, Repecka and Shannon believed that Repecka and Shannon must look to plaintiff, not defendant, for payment; whereas, defendant's good faith might be questioned for he, who has always claimed Repecka and Shannon to be assignees and now represents that "discovery of the assignment (by him) did not take place until after all depositions had been taken" (A.O.B., 45), on the contrary knew from Repecka long before the original complaint and his answer thereto was filed that Repecka and Shannon held the assignments. Repecka testified that in late 1952 or early 1953, he told defendant he "had this assignment" and "mentioned the amount of it too." Moreover we are unaware of any inconvenience or disadvantage to defendant caused by plaintiff's failure to join Repecka and Shannon in the original complaint. Plaintiff sued under his contract for 100 per cent recovery from defendant; the effect of joining Repecka and Shannon was no more than to notify defendant that 30 per cent thereof belonged to them and 70 per cent to plaintiff. This created no new or different obligation on the part of defendant nor did it enlarge or increase the same. It did not alter the position of defendant to his detriment and no new issue was injected into the cause by their joinder, for their claims were not separate and distinct but entirely dependent upon the claim of the original plaintiff—for if the licensees were using ST-131 defendant was obligated to pay one-half of the profits. We see no factors inviting the application of the harsh doctrine urged.

██ Moreover, while appellant has cited cases holding that where, in a situation such as this, there has been a partial assignment all parties claiming an interest in the assignment must be joined as plaintiffs, and as indispensable parties, the court lacks jurisdiction to proceed without them (*Grain* v. *Aldrich*, 38 Cal. 514 [99 Am.Dec. 423]; *Bank of California* v. *Superior Court*, 16 Cal.2d 516 [106 P.2d 879]; *McPherson* v. *Parker*, 30 Cal. 455 [89 Am.Dec. 129]; *Miracle Adhesives Corp.* v. *Peninsula Tile Contractors Assn.*, 157 Cal.App.2d 591 [321 P.2d 482]), Repecka and Shannon in fact were joined prior to trial and are now parties plaintiff; we know of no authority that does not permit their joinder after a complaint has been filed or which holds that their joinder under such circumstances does not confer jurisdiction over the subject matter of the action from the date of the filing of the original complaint. In *Martin* v. *Howe*, 190 Cal. 187 [211 P. 453], a joint owner of a note sued thereon before the statute of limitations had run; his co-owners were joined after it had run. The court held the suit proper and plaintiff's cause not barred by the statute of limitations. Citing 1 Corpus Juris 1110, the court said at page 192: "... a partial assignment may be enforced in equity if the other persons interested are brought in as parties to the suit." An action for an accounting is considered as one in equity. (*Freeman* v. *Donohoe*, 65 Cal.App. 65 [223 P. 431]; *Prince* v. *Lamb*, 128 Cal. 120 [60 P. 689].)

██ In any event plaintiff was entitled to sue even though failing to join the partial assignees, for it is the rule that an assignor may sue with the consent of the assignees (*Mathis* v. *Shamoon*, 114 Cal.App.2d Supp. 829 [250 P.2d 763]; *Reidy* v. *Young*, 119 Cal.App. 322 [6 P.2d 112]); and the voluntary joinder of Repecka and Shannon as co-plaintiffs was in effect a consent to suit. (*Mosier* v. *Suburban Estates Inc.*, 137 Cal.App. 574 [31 P.2d 209].) ██ Moreover, inasmuch as prior to the filing of the complaint Repecka and Shannon looked solely to plaintiff to collect the monies from defendant, as their agent, plaintiff was entitled to sue therefor without joining his assignees for whom he was acting as agent. (*Graham* v. *Light*, 4 Cal.App. 400 [88 P. 373]; *Rissman* v. *National Thrift Corp.*, 139 Cal.App. 447 [34 P.2d 230].)

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.