DALE REDDING, APPELLANT, V. AUDRA GIBBS ET AL.,
APPELLEES.

280 N. W. 2d 53

Filed June 19, 1979.   No. 41908.

True R. Ferguson of Atkins, Ferguson, Hahn & Zimmerman, for appellant.

John F. Wright of Wright & Simmons, for appellees.

Heard before KRIVOSHA, C. J., McCOWN, and BRODKEY, JJ., and RICHLING and CLARK, District Judges.

BRODKEY, J.

Plaintiff, Dale Redding, appeals from a decree entered by the District Court for Sioux County dismissing his petition to foreclose a certain mortgage upon a ranch which the defendant, Cameron Cattle Company, had purchased through mesne conveyances from the original owner, the plaintiff herein.

Plaintiff Redding was the owner of a ranch located in Sioux County which, on June 30, 1967, he sold to the original purchaser, Scottsbluff Angus Ranch, Inc., later renamed Shalco Land & Cattle Company, Inc. As part of that transaction, the purchaser gave Redding a purchase money mortgage and a note in the amount of $500,000 as partial payment therefor. The note and mortgage provided for quarterly payments on interest and/or principal to be made on March 31, June 30, September 30, and December 31 of each year thereafter. The note and mortgage contained an acceleration clause providing that in the event of default in the payment of any installment due for a period of 60 days from the date the same was due, the holder had the option to declare the entire balance of the debt due without notice. The note also contained a provision permitting both the maker and holder at any time to assign or trans-

fer all of their rights and obligations under the note and mortgage, provided any assignment or transfer by the holder would be of the holder's entire interest in both the note and the collateral.

On July 22, 1971, Redding, as the holder of the mortgage on the ranch, assigned all of his interest in the mortgage to Wichita Falls Production Credit Association, Wichita Falls, Texas, hereinafter referred to as Wichita Falls. The purpose of the assignment was to secure certain promissory notes executed by Redding and his son Paul in connection with a loan made to them by Wichita Falls. The assignment contained the condition that when those promissory notes were paid, the assignment would be void. The assignment was recorded in the office of the county clerk of Sioux County on August 27, 1971. Wichita Falls still retains possession of the assignment, and has never cancelled it or reassigned it to Redding. The ranch was sold several times thereafter; and was subsequently conveyed to the defendant, Cameron Cattle Company, hereinafter referred to as Cameron, who bought the ranch on April 3, 1973, subject to the mortgage and note originally given to Redding. Shortly after the purchase of the ranch by Cameron, Wichita Falls advised Cameron in writing that all quarterly payments on the mortgage were to be made directly to Redding unless and until Wichita Falls gave Cameron at least 30 days notice of a default by Redding. It was also stipulated between the parties that on May 1, 1973, Redding gave Cameron a statement of the principal balance due of $467,500, and that the next payment due on the mortgage was on June 30, 1973.

The record reveals that Cameron was anything but regular in making the payments on the mortgage. For example, it appears that the first payment from Cameron was due on June 30, 1973, but was not paid until August 6, 1973, 36 days late. The September 30, 1973, payment was not paid until November

12, 1973, which was 43 days late. The December 31, 1973, payment was made on February 6, 1974, 37 days late. The payment due March 31, 1974, was paid on May 10, 1974, which was 40 days late. It does not appear from the record that any complaint was ever made directly to Cameron about his late payments, although Redding testified he was dissatisfied with the way Cameron was making his payments. Cameron did not tender the payment due on June 30, 1974, until September 25, 1974, after Redding had commenced his foreclosure action. Darrell Cameron, who was the president of Cameron Cattle Company, testified that he was under the impression that the payment he had made in May 1974 was the payment which was due on June 30, 1974. As previously stated, both the note and the mortgage contained a 60-day grace period in which to make each quarterly payment after due; and it appears that Cameron frequently utilized the additional 60 days to make his payments.

It further appears that on or about June 25, 1974, Cameron sold the ranch to Audra Gibbs, who was the executive officer of the Gibbs Cattle Company, hereinafter referred to as Gibbs. In the contract between the parties, Gibbs was given the right to assume the existing mortgage to Redding, which, as previously stated, provided for a 6 percent interest rate. It appears from the record that the Scottsbluff National Bank was holding a prior security interest in the ranch as additional security for indebtedness owed to the Bank by Cameron. For the purpose of protecting its security interest, the Scottsbluff National Bank, hereinafter referred to as Bank, wrote to Redding, advising him the ranch had been sold by Cameron to Gibbs. In its letter of June 27, 1974, the Bank stated: "It is our understanding that the balance is now $457,500.00, and that the interest rate is 6% with payments of $2,500.00 plus interest payable quarterly on March 31st, June 30th, September 30th,

and December 31st of each year. *I would appreciate confirmation of the balance and payments due."* (Emphasis supplied.) The plaintiff did not respond to the Bank's request for a confirmation of the balance and payments due, although the June 30, 1974, payment became due and delinquent.

The record reveals that on or about August 24, 1974, Redding visited the ranch and talked to Cameron. The conversation was primarily with reference to the condition of the grass and the cattle market. However, Cameron then informed Redding that he had sold the ranch to Gibbs, and that he (Cameron) would make the payment due on the mortgage on September 30, 1974, and that the Bank would make all subsequent payments. Cameron testified that he asked the plaintiff "if everything was alright." Cameron testified that Redding replied: "Yes, I just wanted to check on the condition of the ranch." There were no questions or conversation concerning the note and mortgage although the 60-day grace period for the June 30, 1974, payment had nearly expired. Redding testified he knew the June 30, 1974, payment had not been made at the time he visited with Cameron at the ranch on or about August 24, 1974. Redding also testified he was dissatisfied with Cameron's late payments. Plaintiff was asked at the trial: "Why didn't you discuss this matter with Cameron when you met him at the ranch?", to which Redding replied: "I had been talking to my attorney, Mr. Ferguson, and asking him all the time, what I could do and he said, 'There's not a thing you can do, because you gave sixty-days grace,' * * *."

Shortly thereafter, on September 19, 1974, Redding filed this foreclosure action. After the filing of the foreclosure action, the Bank sent Redding the delinquent payments which were due June 30, 1974, and September 30, 1974. Redding returned both payments to the Bank early in October of 1974. On Oc-

tober 15, 1974, Cameron directed the Bank to send the two checks for the delinquent payments to Wichita Falls, the assignee of the mortgage on the ranch. Wichita Falls accepted the tendered payments, and credited Redding's account for them, and then contacted Redding. Redding instructed Wichita Falls to return the payments to the Bank. Wichita Falls did so, referring to their previous statement that Cameron's payments were to be made directly to Redding unless notice to the contrary was given 30 days in advance. Cameron had never previously made the payments to Wichita Falls, but had always sent them directly to Redding.

After trial in the foreclosure action, the trial judge on December 20, 1977, sent a letter to the parties, which letter appears in the transcript, and reads, in part, as follows: "The plaintiff is not the real party in interest. If he is, he is barred under principles of equitable estoppel from foreclosing the mortgage. Given the letter from the Scottsbluff National Bank to which he did not reply and his conference with Mr. Cameron at the time the payment was delinquent, I think he had a duty to speak. It would be *unconscionable* to permit foreclosure under these circumstances." (Emphasis supplied.) The court entered his order to the same effect on December 20, 1977, and Redding then perfected his appeal to this court. For the reasons hereinafter set forth, we affirm the judgment and decree of the District Court.

In his brief on appeal, Redding makes two principal assignments of error. First, he contends the District Court erred in finding that the plaintiff was not the real party in interest; and second, the District Court erred in finding that even if the plaintiff was the real party in interest, he was equitably estopped, by unconscionable conduct, from foreclosing on the mortgage.

We first address Redding's contention that he was the real party in interest and should have been al-

lowed to maintain the foreclosure suit. Section 25-301, R. R. S. 1943, provides: "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided in section 25-304." Section 25-304, R. R. S. 1943, does not provide an exception applicable to the instant case. Redding argues that his assignment to Wichita Falls was a conditional assignment for security purposes only, and that he should be permitted to prosecute the action because Wichita Falls consented that he could do so. In support of his contention, counsel for Redding relies principally on two cases, Greco v. Oregon Mut. Fire Ins. Co., 191 Cal. App. 2d 674, 12 Cal. Rptr. 802 (1961); and Taylor v. Sanford, 203 Cal. App. 2d 330, 21 Cal. Rptr. 697 (1962). Counsel for Redding has cited the above authorities for the proposition that when an assignee gives his consent in some form to an action brought by the assignor on the chose in action, the assignor will be allowed to maintain the suit as the real party in interest. In the case of State, ex rel. Sorensen v. Nemaha County Bank, 124 Neb. 883, 248 N. W. 650 (1933), we stated: " 'In ascertaining whether the plaintiff is the real party in interest, the primary and fundamental test to be applied is whether the prosecution of the action will save the defendant from further harassment or vexation at the hands of other claimants to the same demand. If the defendant is not cut off from any just defense, offset, or counterclaim against the demand and a judgment in behalf of the party suing will fully protect him when discharged, then is his concern at an end.' 2 Bancroft, Code Practice and Remedies, 1094." See, also, Archer v. Musick, 147 Neb. 1018, 25 N. W. 2d 908 (1947).

Redding claims that Wichita Falls has in effect consented to this suit, and therefore Redding may maintain this suit as the real party in interest. As evidence of such consent by Wichita Falls, Redding points out the fact that he has always retained the

mortgage and note in his possession; and he cites authorites in which an assignor was allowed to maintain a suit as the real party in interest after the assignee reassigned or delivered the note to the assignor, thus evidencing the assignee's consent to the assignor's bringing the suit. He also argues that Wichita Falls has demonstrated its consent to the present suit when it authorized all payments on the note and mortgage to be made directly to him; and also that Wichita Falls returned the June 30, 1974, and September 30, 1974, payments it received from Cameron after Redding informed Wichita Falls that he was foreclosing on the mortgage.

A similar issue was presented to this court in Burns v. Hockett, 91 Neb. 546, 136 N. W. 348 (1912). The Burns case was also a foreclosure action which this court was rehearing on the basis of the mortgagors' allegation that the mortgagees had assigned their interest in the note and mortgage before the suit was instituted. In that case we stated: "At the time mortgagees decided to bring the suit, the note and mortgage were in possession of the Union State Bank. By formal assignment they were then held as collateral security for the payment of a debt owing by mortgagees to the bank, but a careful consideration of all of the evidence requires a finding that the bank had surrendered the note and mortgage to mortgagees without condition before the action was instituted, that they were the legal owners of the security when they filed their petition, and that the bank had full knowledge of their purpose to foreclose the mortgage and of their prosecution of the suit. This finding fully justifies the dismissal from which mortgagors have appealed.

"The surrender and the redelivery of the note and mortgage to the payees transferred to them the title thereto. They were the legal holders of the security when they sued mortgagors." In Burns, the bank surrendered and redelivered the note and mortgages

after first having taken possession of them; and this court found that as a result of the redelivery of the note and mortgage to the mortgagors, legal title was held by the mortgagors at the time their suit was commenced.

In the instant case, however, the mortgage was never reassigned to Redding by Wichita Falls, nor was there any document from Wichita Falls releasing the assignment of record or consenting to Redding's foreclosing of the mortgage. It is true that in this case Redding always retained possession of the note and mortgage. However, no affirmative action was ever taken by Wichita Falls indicating they were consenting to the present suit. The mortgage was never delivered to Wichita Falls, although its assignment was recorded. We conclude that Wichita Falls held legal title to the mortgage as a result of the assignment at the time the action was commenced, and was the proper party to bring the law suit. We also point out, however, that under section 25-304, R. R. S. 1943, Nebraska has not recognized "consent" as being an exception to the requirement under section 25-301, R. R. S. 1943, that actions be prosecuted by the real party in interest.

Redding also contends the District Court erred in finding that even if Redding could be considered the real party in interest, he is barred upon equitable principles from foreclosing the mortgage and that under the facts present in the instant case it would be inequitable to permit him to do so. The court stated: "Given the letter from Scottsbluff National Bank to which he [Redding] did not reply and his conference with Mr. Cameron at the time the payment was delinquent, I think he had a duty to speak. It would be *unconscionable* to permit foreclosure under these circumstances." (Emphasis supplied.) Redding contends, however, that under the existing law of Nebraska, the doctrine of equitable estoppel is not applicable. While it may be true that not all

the elements of the doctrine of equitable estoppel are present in this case, nevertheless we believe the facts of this case afford a proper situation where equity may afford relief from a technical acceleration of a mortgage under an acceleration clause because of the harsh, oppressive, and unconscionable conduct of the mortgagee. The law is well established, and the general rule is stated in an annotation in 70 A. L. R. 993 et seq. entitled "Grounds of relief from acceleration clause in mortgage." The general rule is there stated as follows: "It is held, apparently without dissent, that a court of equity has the power to relieve a mortgagor from the effect of an operative acceleration clause, when the default of the mortgagor was the result of some unconscionable or inequitable conduct of the mortgagee." Cases from at least 15 jurisdictions are cited to that effect in that annotation, including the case of Morling v. Bronson, 37 Neb. 608, 56 N. W. 205 (1893). Although not following the general rule above cited in that case, it is clear that, inferentially at least, Nebraska recognizes the general rule, as the court in that case stated: "Courts of equity will sometimes interfere to relieve a party who has been betrayed by the unconscionable or illegal or fraudulent conduct of another, * * *." See, also, 59 C. J. S., Mortgages, § 495 (6), p. 794 et seq.; Rosenthal, The Role of Courts of Equity In Preventing Acceleration Predicated Upon a Mortgagor's Inadvertent Default, 22 Syracuse Law Rev. 897 (1971). It appears some courts have granted relief to prevent acceleration predicated on an inadvertent default where there were indications the mortgagee had knowledge of the default and, subsequent to the expiration of the grace period, in *personal* dealings with the mortgagor had failed to inquire about the delayed payment but immediately thereafter brought an action to foreclose. Id. at p. 906.

A case of this nature, factually similar to the in-

stant case, is Arizona Coffee Shops, Inc. v. Phoenix Downtown Park. Ass'n, 95 Ariz. 98, 387 P. 2d 801 (1963). In that case the mortgagor missed the March 1st payment of principal and interest because of the inadvertent error of its bookkeeper who had been ill. (The bookkeeper was the wife of the mortgagor's president.) At the time of the default, the defendant had paid $173,500 of principal and interest. As a defense, the mortgagor alleged that after the March 1st payment became due its president bought a gift for his wife at the shop owned by the corporate mortgagee and, although the mortgagee was advised of the bookkeeper's illness, he made no mention of the fact that the payment had not been received. The court found nothing in the record to indicate the mortgagee was prejudiced, and that the default was entirely out of proportion to the harshness of the plaintiff's action in declaring the entire debt due. In that case the court stated: "Circumstances may exist where the withholding of the right to accelerate by a court of equity is appropriate. Were this not true, there would be no occasion for the enforcement of equitable doctrines." There the mortgagor immediately tendered the overdue payments upon learning of the default and commencement of the foreclosure action, as was done in this case. The mortgagor rejected the tendered payment. The Arizona Supreme Court stated: "It is universally held in equity that unconscionable conduct of the mortgagee constitutes a valid defense to a mortgage foreclosure." See, also, Lieberbaum v. Surfcomber Hotel Corp., 122 So. 2d 28 (Fla. App., 1960); Federal Home Loan Mortgage Corp. v. Taylor, 318 So. 2d 203 (Fla. App., 1975); Domus Realty Corp. v. 3440 Realty Co., Inc., 179 Misc. 749, 40 N. Y. S. 2d 69 (1943). In Domus the court defined the terms "oppressive" and "unconscionable" as follows: "Tested by ordinary definition and by common understanding, 'oppressive' means conduct that

is unjustly burdensome, harsh or merciless and 'unconscionable' means conduct that is monstrously harsh, that is shocking to the conscience."

The philosophy or rationale behind the rule allowing relief on equitable principles was well stated in a frequently quoted dissenting opinion by Justice Cardozo in a 1930 New York case, Graf v. Hope Building Corp., 254 N. Y. 1, 171 N. E. 884, as follows: "When an advantage is unconscionable depends upon the circumstances. It is not unconscionable generally to insist that payment shall be made according to the letter of the contract. It may be unconscionable to insist upon adherence to the letter where the default is limited to a trifling balance, where the failure to pay the balance is the product of mistake, and where the mortgagee indicates by his conduct that he appreciates the mistake and has attempted by silence and inaction to turn it to his own advantage. The holder of this mortgage must have understood that he could have his money for the asking. His silence, followed, as it was, by immediate suit at the first available opportunity, brings conviction to the mind that he was avoiding any act that would spur the mortgagor to payment. What he did was almost as suggestive of that purpose as if he had kept out of the way in order to avoid a tender. * * * Demand was, indeed, unnecessary to bring the debt to maturity at law. There is not a technical estoppel. * * * The consequence does not follow that, in conditions so peculiar, the omission to make demand is without significance in equity. Significant it may then be in helping the court to a determination whether the conduct of a suitor in taking advantage of a default, so easily averted and so plainly unintentional, is consistent with good conscience. * * * True, indeed, it is that accident and mistake will often be inadequate to supply a basis for the granting or withholding of equitable remedies where the consequences to be corrected might have been avoided if the victim of

the misfortune had ordered his affairs with reasonable diligence. * * * The restriction, however, is not obdurate, for always the gravity of the fault must be compared with the gravity of the hardship. * * * Let the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path. * * *.''

In deciding whether or not equitable relief should be granted in situations such as this, it is clear the gravity of the fault must be weighed against the gravity of the hardship. In this case it is clear the hardship which would be caused to Cameron, and incidentally to the Bank, by allowing Redding to foreclose the mortgage, would be harsh, oppressive, and unconscionable. If Cameron were required to refinance after foreclosure of the mortgage, in view of his written guarantee to Gibbs that he could assume a 6 percent mortgage, the financial loss to him might very well be disastrous. An officer from the Bank testified as follows: ''With the figures I had at hand, with any raise in the interest rate, I figured one per cent would be about $54,000 additional cost to Cameron, which would decrease our equity that amount, so if it were increased three per cent, it would be a hundred and fifty some thousand. Four per cent would be two hundred and some thousand, which would decrease our equity ---.''

In this case it is clear Redding knew the property had been sold and all the parties were relying on the payments being current. He did not advise the Bank the payments were not current, even though he received a letter from the Bank requesting that information. Cameron relied upon Redding's statement made to him at the ranch that everything was all right, and the Bank relied upon the letter it sent to Redding regarding the payments. It is clear all of the defendants could and would have made the payment immediately if Redding had made demand upon them or informed them the payments were

late. Although perhaps not legally required to give that information to the mortgagor, Redding's failure to make such a demand is not without significance, especially in situations where it may appear the default was small and the mortgagee had not in the past insisted on prompt payment. It appears Cameron's failure to make the delinquent payments was due to inadvertence. He testified as follows: "Q. Did you have any idea at that time that you were delinquent or about to become delinquent in your June 30 payment? A. No, I was under the impression that the payment that I made in May was the June 30 payment. Q. Did you interpret Mr. Redding's response that everything was alright, that there was no problems with the payments? * * * A. There was nothing said about any payment or anything at all. I had no suspicions that anything was wrong with any payment. * * * Q. Were you prepared to make the June 30 payment at that date? A. Oh, yes, financially I was prepared." Redding commenced his foreclosure action almost immediately after the running of the 60-day grace period. He made no demand for payment before commencing suit, although it is clear payment would have been forthcoming immediately. Although, technically, he may not have been required to demand payment before instituting his foreclosure action, nevertheless his failure to do so in this situation was clearly harsh, oppressive, and unconscionable, and strongly suggests that he wished to take advantage of defendant Cameron's situation. The equities in this case preponderate in favor of the defendants and, in our opinion, justify the action of the trial court in dismissing plaintiff's petition.

For the reasons set forth above in this opinion, the judgment and decree of the lower court must be affirmed.

AFFIRMED.